IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:11-CV-238-D

| | | |
|---|---|---|
| JENNIFER YERGER, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | **ORDER** |
| | ) | |
| LIBERTY MUTUAL GROUP, INC., | ) | |
| | ) | |
| Defendant. | ) | |

On May 13, 2011, plaintiff Jennifer Yerger ("plaintiff" or "Yerger") filed suit on behalf of herself and all other similarly situated and consenting persons against Liberty Mutual Group, Inc. ("defendant" or "Liberty Mutual"). Compl. [D.E. 2]. Yerger alleges that Liberty Mutual failed to pay overtime wages in accordance with the Fair Labor Standards Act ("FLSA") and seeks reimbursement for unpaid overtime. See Compl. ¶ 1. On June 3, 2011, Yerger filed a motion asking the court to conditionally certify this action as a FLSA collective action under 29 U.S.C. § 216(b) "for all [f]ield [a]uditors employed by Liberty Mutual . . . at any time in the three years prior to the date notice is mailed until the date final judgment is entered . . . who were not paid" overtime wages under 29 U.S.C. § 207(a)(1) [D.E. 6]. Liberty Mutual opposes the motion [D.E. 28]. As explained below, the court denies the motion to conditionally certify this action as a FLSA collective action.

I.

Liberty Mutual is a member of the Liberty Mutual Group of companies, an international insurance corporation. Pl.'s Mem. Supp. Mot. Certification [D.E. 7] 1; Def.'s Reply [D.E. 28] 4. Liberty Mutual operates through four semi-independent business units, with each business unit employing its own president, reporting its own quarterly earnings, and maintaining separate assets and operations. Def.'s Reply, Att. 1 ("Lahey Decl.") ¶¶ 2–3. In the United States, Liberty Mutual

offers commercial insurance through two of its business units and one of its subsidiary corporations.[1] See id. ¶¶ 2, 6–7; Def.'s Reply, Atts. 3 ("Laliberte Decl.") ¶¶ 2–3, 4 ("Kochman Decl.") 1–2.

Liberty Mutual employs field premium auditors ("field auditors") in its three commercial insurance businesses. See Def.'s Reply 8. Field auditors visit and inspect the facilities of Liberty Mutual's commercial insurance customers, analyze the customers' financial and payroll records, and then file in a computer database reports based on these on-site visits. See Laliberte Decl. ¶ 5; Pl.'s Mem. Supp. Mot. Certification 2; id., Att. 3 ("Yerger Decl.") ¶¶ 4–6. Liberty Mutual then uses the field auditors' reports in setting premium rates for its commercial customers. Def.'s Reply 6; Pl.'s Mem. Supp. Mot. Certification 2. While field auditors in the three commercial insurance businesses do similar work, Liberty Mutual states that each of the three has "a distinct and separately managed Premium Audit organization," with field auditors in the respective units auditing "only the policyholders of that particular business." Def.'s Reply 8; see Laliberte Decl. ¶ 3; Kochman Decl. ¶ 3; Smithson Decl. ¶ 4. The audit organizations within the three businesses "each have different methods for assigning audits, different audit reporting software systems, different audit review processes,[2] and different time-keeping requirements." Def.'s Reply 9; see Laliberte Decl. ¶¶ 7–8;

---

[1]These groups include (1) the commercial markets business unit, which offers only commercial lines insurance products and services and targets mid-size to large customers, (2) the Liberty Mutual Agency Corporation ("LMAC"), which offers commercial and personal lines insurance products through eight regional subsidiaries, targeting smaller commercial customers, and (3) Summit Consulting, Inc. ("Summit"), a regional subsidiary operating almost exclusively in the southeastern United States, which offers only workers' compensation insurance to small to mid-size commercial customers. Laliberte Decl. ¶ 2; Kochman Decl. ¶ 2; Def.'s Reply, Att. 5 ("Smithson Decl.") ¶ 3.

[2]According to Liberty Mutual, in its commercial markets business unit, it reviews less than 15% of field auditors' audit reports, with a manager selecting the reports to be reviewed at random until a recent policy change. Laliberte Decl. ¶ 8. In the LMAC unit, field auditors select the audit reports that they wish to have reviewed, resulting in managers reviewing only a small percentage of reports. Kochman Decl. ¶ 7. In the Summit unit, management randomly selects audits for review, reviewing reports of less-senior auditors more frequently than those of more-senior auditors.

2

Kochman Decl. ¶ 7. Additionally, each commercial insurance business has seven different levels of field auditor positions, and each level has a distinct job description. Laliberte Decl. ¶ 4; see Kochman Decl. ¶ 4; Smithson Decl. ¶ 5.

Between June 2006 and February 2011, Yerger worked for Liberty Mutual's commercial markets business unit as a field auditor, based in Johnson County, North Carolina. Compl. ¶¶ 5, 16; Pl.'s Mem. Supp. Mot. Certification 1–2. In North Carolina, Liberty Mutual's commercial markets business unit has a contract with the state to provide auditing and processing services for North Carolina's "involuntary market" insurance pools. Laliberte Decl. ¶ 6; Def.'s Reply, Att. 6 ("Rose Decl.") ¶ 4. This insurance pool consists of small businesses unable to independently purchase worker's compensation or commercial vehicle liability insurance. Laliberte Decl. ¶ 6. By joining the state-managed pool, each small business is able to obtain worker's compensation insurance at annual premiums of approximately $1,000 to $25,000. See Laliberte Decl. ¶ 12; Rose Decl. ¶ 4. Liberty Mutual reports that during the time in which Yerger worked for its commercial markets business unit, between 60 and 70 percent of the North Carolina businesses that the commercial markets business unit audited participated in the state's involuntary market pool, employed between three and four persons, and paid the minimum annual premium of $1,000. Rose Decl. ¶ 5. Furthermore, field audits of involuntary market pool participants tend to be substantially less complex than the audits of mid-size and large businesses, which have higher annual premiums and many more employees. See Laliberte Decl. ¶ 12; Rose Decl. ¶ 5. Accordingly, Yerger's work was much less complex than the work of field auditors in states where Liberty Mutual did not contract with the state to service involuntary market pool participants. See Laliberte Decl. ¶ 12; Rose Decl. ¶ 5. Despite performing relatively uncomplicated work, Yerger "exhibited a lack of confidence in

---

Smithson Decl. ¶ 8.

3

her decision-making, and as a result . . . consulted her supervisor for assistance more frequently than other [field auditors]." Def.'s Reply 8 (quotation omitted); see also Rose Decl. ¶ 6; cf. Yerger Decl. ¶ 7 ("I was on the phone all the time to speak with my immediate supervisor about what determination I should make if that determination was not routine.").

Yerger states that she and other field auditors routinely worked more than forty hours per week.[3] Pl.'s Mem. Supp. Mot. Certification 2; Yerger Decl. ¶¶ 9, 11. She states that Liberty Mutual expected her and other field auditors to work more than forty hours per week, and provided them with remote access to the company computer network and cellular telephones to facilitate after-hours work. Pl.'s Mem. Supp. Mot. Certification 2; Yerger Decl. ¶¶ 9, 13–15. Yerger also alleges that Liberty Mutual maintained a company-wide policy of not providing overtime pay to field auditors like Yerger, despite its knowledge that field auditors regularly worked overtime hours. Pl.'s Mem. Supp. Mot. Certification 3; Yerger Decl. ¶¶ 18–20; see Compl. ¶ 20.

Yerger alleges that until January 1, 2011, Liberty Mutual paid her a bi-weekly salary that reflected a 37.5-hour work week. Compl. ¶ 18; Yerger Decl. ¶ 16, 20. Yerger calculates that her regular hourly rate for the purposes of computing overtime under the FLSA during this period was $11.89.[4] Pl.'s Mem. Supp. Mot. Certification 2–3.

---

[3] Yerger bases her claim that other field auditors also worked more than forty hours per week on her "review of Liberty Mutual's end-of-the-year monthly metrics reports for 2009 and 2010 . . . ." Yerger Decl. ¶ 11.

[4] To reach this conclusion, Yerger begins with her semi-monthly salary of $966.20 and multiplies that by 24, resulting in a total annual salary of $23,188.80. See 29 C.F.R. § 778.113(b). She then divides $23,188.80 by 52 weeks, resulting in a weekly salary of $445.94. Id. She then determines her hourly rate by dividing $445.94 by the number of hours that the total "is intended to compensate," 37.5 in this case. See id. § 778.113(a). According to Yerger, this calculation results in an hourly rate of $11.89.

4

On May 13, 2011, Yerger filed suit against Liberty Mutual on behalf of herself and all other similarly situated and consenting persons [D.E. 2]. Yerger alleges that Liberty Mutual failed to pay overtime wages in accordance with the FLSA and seeks unpaid overtime. See Compl. ¶¶ 30–32. Yerger now moves the court to conditionally certify this action as a FLSA collective action under 29 U.S.C. § 216(b) [D.E. 6]. Specifically, Yerger seeks an order

> 1. [c]onditionally certifying this action as a FLSA collective action pursuant to 29 U.S.C. § 216(b) for all Field Auditors employed by Liberty Mutual Group, Inc. at any time in the three years prior to the date notice is mailed until the date final judgment is entered in this action, and who were not paid wages at the overtime rate required by 29 U.S.C. § 207(a)(1);
>
> 2. [d]irecting defendants to produce to the plaintiff the names, and addresses of any and all putative members of this collective action members [sic] in digital format, within 10 days of this Order; [and]
>
> 3. [a]pproving the mailing of a collective action Notice by plaintiff, within 14 days from the provision of names and addresses by defendants, in the form provided by plaintiff and mailed under 29 U.S.C. §216(b) of the Fair Labor Standards Act; and mailed under 29 U.S.C. §216(b) of the Fair Labor Standards Act . . . .

Pl.'s Mot. Certification ¶¶ 1–3. Liberty Mutual opposes the motion [D.E. 28].

II.

Under the FLSA, an employee may bring an action to recover unpaid overtime wages "for and in behalf of himself . . . and other employees similarly situated." 29 U.S.C. § 216(b).[5] The FLSA class certification has two requirements: (1) that the plaintiffs in the class be "similarly situated," and (2) that the plaintiffs "opt in" by filing with the court their consent to suit. Id. Here,

---

[5] "[I]n discussing the representative action [under the FLSA], most courts utilize class action terminology from Rule 23 cases." Mooney v. Aramco Servs. Co., 54 F.3d 1207, 1212 (5th Cir. 1995) overruled on other grounds by Desert Palace, Inc v. Costa, 539 U.S. 90 (2003). However, Federal Rule of Civil Procedure 23 imposes a more stringent standard for class certification than section 216(b). E.g., O'Brien v. Ed Donnelly Enters., Inc., 575 F.3d 567, 584–85 (6th Cir. 2009); Gayle v. United States, 85 Fed. Cl. 72, 77 (2008); cf. Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2548–57 (2011) (discussing class certification under Fed. R. Civ. P. 23(a)).

the parties dispute whether the proposed opt-in plaintiffs are "similarly situated" under 29 U.S.C. § 216(b). Section 216(b) does not define "similarly situated" and neither has the Fourth Circuit.

Whether to grant conditional certification is within the discretion of the district court. See, e.g., Anderson v. Cagle's, Inc., 488 F.3d 945, 951 (11th Cir. 2007). In deciding whether to certify a class under section 216(b), courts have generally applied a two-step analysis. "First, the court determines whether the putative class members' claims are sufficiently similar to merit sending notice of the action to possible members of the class." Acevedo v. Allsup's Convenience Stores, Inc., 600 F.3d 516, 519 (5th Cir. 2010) (per curiam). "If they are, notice is sent and new plaintiffs are permitted to 'opt in' to the lawsuit." Id. "Second, after discovery is largely complete and more information on the case is available, the court makes a final determination of whether all plaintiffs are sufficiently similarly situated to proceed together in a single action." Id.

At the conditional certification phase, "[a] plaintiff has the burden of showing a 'reasonable basis' for his claim that there are other similarly situated employees." Morgan v. Family Dollar Stores, Inc., 551 F.3d 1233, 1260 (11th Cir. 2008). The standard for determining similarity at this initial stage is "not particularly stringent . . . ." Hipp v. Liberty Nat'l Life Ins. Co., 252 F.3d 1208, 1214 (11th Cir. 2001) (per curiam); Grayson v. K Mart Corp., 79 F.3d 1086, 1097 (11th Cir. 1996); Mooney, 54 F.3d at 1214. Nonetheless, for conditional certification to be appropriate, a plaintiff must show that similarity exists between positions, not that their positions relative to putative class members are identical. See, e.g., Morgan, 551 F.3d at 1259–60; Grayson, 79 F.3d at 1096. In assessing conditional certification, courts examine a variety of factors, "including the factual and employment settings of the individual[] plaintiffs, the different defenses to which the plaintiffs may be subject on an individual basis, [and] the degree of fairness and procedural impact of certifying the action as a collective action." O'Brien, 575 F.3d at 584 (quotation omitted) (alterations in

6

original). At the conditional certification stage, a named plaintiff "must raise a similar legal issue as to coverage, exemption, or nonpayment o[f] . . . overtime arising from at least a manageably similar factual setting with respect to their job requirements and pay provisions, but their situations need not be identical." De Luna-Guerrero v. N.C. Grower's Ass'n, Inc., 338 F. Supp. 2d 649, 654 (E.D.N.C. 2004) (quotation omitted). Finally, "[m]ere allegations will not suffice; some factual evidence is necessary." Bernard v. Household Int'l, Inc., 231 F. Supp. 2d 433, 435 (E.D. Va. 2002).

Yerger contends that the putative class members are similarly situated in that Liberty Mutual subjected all members of the putative class "to the same illegal policy of . . . denying overtime and/or minimum wages" in violation of the FLSA. Pl.'s Mem. Supp. Mot. Certification 7. Yerger argues that "district courts routinely grant conditional certification" in factually similar cases. Id.

In opposition to conditional certification, Liberty Mutual argues that Yerger has failed to demonstrate that she is similarly situated to the class members on whose behalf she seeks conditional certification. Def.'s Reply 2. Specifically, Liberty Mutual argues that Yerger's "work as a field [p]remium [a]uditor was significantly different from the work performed by other field [p]remium [a]uditors . . . ." Id.[6] Liberty Mutual also argues that Yerger has failed to meet her burden of demonstrating that her work was similar to the work of field auditors in the business unit in which she was employed, or to the work of field auditors in the other Liberty Mutual business groups that employ field auditors. Id. Finally, Liberty Mutual argues that Yerger's claim "is not amenable to collective action treatment" because of the fact-intensive questions that it presents. Id.

---

[6]Liberty Mutual highlights the following differences between Yerger's work and the work of its other field auditors: "the customers that [Yerger] audited were substantially smaller than the customers audited by many other . . . [a]uditors"; "[t]he bulk of [Yerger's] audits were substantially less complex than those of other auditors"; and Yerger "was atypically reluctant to make difficult decisions on her own," causing her to exercise "significantly less discretion and independent judgment in performing her work than her peers." Id.

7

In her motion, supporting memorandum, and accompanying declaration, Yerger makes no effort to substantiate her claims, stating only that Liberty Mutual expected Yerger and its other field auditors to work more than forty hours per week, and that it used a common schedule to compensate its field auditors. See Pl.'s Mem. Supp. Mot. Certification 2; Yerger Decl. ¶¶ 10–11, 16. When Liberty Mutual discussed the evidentiary shortcomings in Yerger's motion, memorandum, and declaration, Yerger submitted additional evidence in support of her motion. In doing so, Yerger cited Kelly v. Bluegreen Corp., 256 F.R.D. 626, 629 (W.D. Wis. 2009). In Kelly, the court held that the plaintiffs seeking to introduce new evidence in support of conditional certification only after the defendant attacked the plaintiffs' initial showing "should have included [the additional evidence] with their original materials . . . ." Id. However, the court held that it would consider the new evidence because the defendant had not objected to the additional submissions. Id.

Here, Liberty Mutual did not object to Yerger's additional evidence; therefore, the court considers it. Nonetheless, the court notes that the better practice is to submit the requisite evidence with the motion to certify.

As for Yerger's additional evidence, Yerger cites various Liberty Mutual field auditor job descriptions. Pl.'s Reply [D.E. 30] 4 n.9; see Laliberte Decl., Exs. A–G. She then notes that of the ten responsibilities listed for her field auditor position, seven are also listed for other field auditor positions within the commercial markets business unit. Pl.'s Reply 4 n.9. Yerger also provides declarations from six other Liberty Mutual field auditors. See id., Exs. 1–6. Each declarant affirms that Liberty Mutual expected field auditors to work more than forty hours per week and did not pay overtime compensation for such work. Id.

As for the six declarations, the declarants are an exceedingly small sample of the class that Yerger seeks to represent. In fact, each declarant appears to have worked for the commercial

8

markets business unit, all but one of the declarants worked for Liberty Mutual in the southeastern United States (the other worked in Illinois), and none of the declarants attained a higher-level field auditor job grade. Id. Furthermore, the declarations essentially recite the same language, suggesting that the declarants signed them without significant reflection. See id.

At best, the six declarants suggests that Yerger may be similarly situated to other field auditors working at a similar employment level for Liberty Mutual's commercial markets business unit in a single region of the United States. To reach such a conclusion, the court must assume that the six declarants are an adequate cross-section of all of the field auditors employed by Liberty Mutual in its commercial markets business unit in the southeastern United States. The court, however, is reluctant draw such a conclusion about a group of hundreds of potential plaintiffs. Moreover, the six declarations do little to demonstrate that Yerger is similarly situated with the nationwide class of plaintiffs that she seeks to represent. See Def.'s Reply 19 ("[I]n this case, [Yerger] has not presented any evidence whatsoever regarding auditors in other grades, in other titles, with other supervisors, in other regions within the Commercial Markets business unit, or in LMAC or Summit.").[7] In fact, Yerger's declarations are similar to those that the plaintiff presented to the Eastern District of Virginia in Bernard. In Bernard, the court held that preliminary certification was inappropriate when plaintiff alleged that the defendant-employer maintained a nationwide policy of denying overtime pay; however, in seeking to certify a class, plaintiff had presented declarations of the employees at only two of the company's offices. Bernard, 231 F.

---

[7]Yerger argues that Liberty Mutual's 2010 Annual Report suggests that Liberty Mutual's business units "are part of an integrated business entity . . . operating under one board of directors." Pl.'s Reply 6; id., Ex. 7 ("2010 Liberty Mutual Annual Report") 22–23, 40–41, 68–71. Liberty Mutual does not contest the fact that it is a single corporate entity. Nonetheless, Yerger's assertion fails to rebut Liberty Mutual's evidence that the business units are substantially autonomous.

9

Supp. 2d at 435–36. The court rejected the plaintiff's argument that the declarants' statements reflected knowledge of the defendant's employment practices outside of their individual offices. Id. Similarly, Yerger's six declarations fail to provide the required evidence "of a company-wide policy." Id. at 436.

As for the Liberty Mutual job descriptions, this evidence is equally unpersuasive. Yerger's citation of the job descriptions fails to take into account the inherently distinct nature of each position, which necessitates the individual positions in the first place. The job description also fails to reflect that workers in these different positions were in fact subject to the same pay practices as Yerger.

Finally, Yerger has failed to rebut the substantial evidence that Liberty Mutual presented, which indicates that her specific work as a field auditor in Johnson County, North Carolina, was substantially different from the work of other Liberty Mutual field auditors. Liberty Mutual's evidence shows that Yerger performed smaller, less complex audits, and yet still exercised less discretion and independent judgment than her peers. Rose Decl. ¶¶ 5–6.

In opposition to Liberty Mutual's evidence, Yerger cites Perry v. National City Mortgage, Inc., No. 05-cv-891-DRH, 2007 WL 1810472, at *3–4 (S.D. Ill. June 21, 2007) (unpublished), and argues that day-to-day variations in an employees' activities do not preclude conditional certification when all employees hold the same position within the company. However, in Perry, the prospective class members all had the same position and job description with the defendant corporation, with the day-to-day differences in the prospective plaintiffs' work attributable to the various class members' varying years of experience. Id. at *3. In contrast, the evidence in this case shows that Yerger's individual work was substantially different from the class members that she seeks to represent, for reasons other than merely varying levels of experience between Yerger and other

10

potential plaintiffs. Yerger does not deny that these differences exist, and instead relies only on the mere allegation that she and the other proposed class members all had the same "primary function [of performing] field audits." Pl.'s Reply 7; see Bernard, 231 F. Supp. 2d at 435. Yerger's assertion does little to account for the differences between Yerger's individual work in Johnson County, North Carolina, and the work of the other Liberty Mutual field auditors employed across the country at seven different employment levels across three different business units.

Although Yerger's burden of establishing her entitlement to conditional certification is modest, she has failed to meet it. See Ceras-Campo v. WF P'ship, No. 5:10-CV-215-BO, 2011 WL 588417, at *3 (E.D.N.C. Feb. 9, 2011) (unpublished) ("[O]n such a thin showing from the Plaintiff, it is unclear how [the remedial purpose of the FLSA] applies to anyone other than to the Plaintiff himself."). Thus, the court denies Yerger's motion for conditional certification.

III.

In sum, the court DENIES plaintiff's motion for conditional certification [D.E. 6].

SO ORDERED. This 15 day of November 2011.

JAMES C. DEVER III
Chief United States District Judge